WITTEN LAW, LTD.
Jason B. Witten (SBN 220612)
Blackwell House
Guildhall Yard
London, England EC2V 5AE
Email: j.witten@wittenltd.com
Tel. 011-44-203-287-9500

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| WANG, HARTMANN, GIBBS & CAULEY, PLC, a California Professional Law Corporation,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>JASON BRIAN WITTEN, an individual; and WANG, HARTMANN, GIBBS & CAULEY, LTD., a United Kingdom Private Limited Company,<br><br>　　　　　Defendants. | Case No. SACV10-1499-JVS (MLGX)<br>Assigned for All Purposes to:<br>Judge James V. Selna<br><br>**DEFENDANTS' WITTEN AND WANG, HARTMANN, GIBBS & CAULEY, LTD.'S NOTICE OF MOTION AND FED.R.CIV.P. RULE 11 MOTION FOR SANCTIONS AGAINST PLAINTIFF WANG, HARTMANN, GIBBS & CAULEY, RICHARD F. CAULEY, JEFFREY C.P. WANG AND FUTURE LEAD ATTORNEY FOR PLAINTIFF**<br><br>Hearing:<br>Date: January 24, 2011<br>Time: 1:30 pm<br>Dept. 10C |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on  January 24, 2011  at 1:30 pm in Department 10C of the above captioned Court located at 411 West 4th Street, Santa Ana, California 92701, Defendants Jason Witten and Wang, Hartmann, Gibbs & Cauley, Ltd. will

i

1  respectfully move for sanctions against Plaintiff Wang, Hartmann, Gibbs & Cauley, PLC, as
2  well as its attorneys Richard Cauley, Jeffrey Wang and any new lead counsel pursuant to
3  Fed.R.Civ. P. Rule 11.
4          This motion is made pursuant to Federal Rule of Civil Procedure 11 and L.R. 11-9,
5  and on the concurrently filed: a) Points and Authorities, b) Declaration of Jason Witten, c)
6  Exhibits, and d) accompanying proposed Order, as well as the pleadings on file with this
7  Court, and any further evidence the Court may seek.

9  Respectfully Submitted,                          WITTEN LAW, LTD.

11 Dated: November 5, 2010

12                                                  Jason B. Witten
13                                                  Attorney for Defendants

ii

Defendants' Fed.R.Civ.P. Rule 11 Motion for Sanctions

## **Table of Contents**

**Memorandum of Points & Authorities**……………………..……………………… 1

**I. Legal Standard**…………………………………………………………………… 2

**II. Statement of Facts**……………………………………………………………… 3

A. Formation of the Plan for the UK Office was discussed between Wang & Witten.. 3

B. The UK Office Business Plan was Implemented…………………………………..4

C. Wang, the Alter-Ego of WHGC CA Authorized Witten

To Open the UK Office Pursuant to the Business Plan………………………………..6

D. The Business Plan was Performed……………………………………………… 8

E. Wang Reveals that He Does Not want the UK Office to Succeed……………… 9

F. The UK Office Handles its First WHGC CA Client

Needing EU Services According to the Business Plan……………………………… 9

G. Wang Sets in Motion His Plan to the Breach of the Agreement………………… 11

H. Wang Begins to Compromise Clients' Rights in Order to Damage Witten……… 13

I.  Wang Concocts a Controversy to Cut-Off Witten from Clients………………… 15

J.  WHGC CA Authorizes Witten to Conduct Business

Using WHGC Marks While Secretly Filing the Frivolous Complaint……………… 17

K. The Parties Enter a Settlement Agreement……………………………………… 18

**II. Discussion**……………………………………………………………………… 19

A. Settlement Agreement…………………………………………………………… 19

B. Breach of Fiduciary Duty………………………………………………………… 19

C. Fraud/Conversion /Unfair Competition/Declaratory Relief……………………… 22

D. Trademark Infringement………………………………………………………… 23

**III. Compliance with The Safe Harbor Rule**……………………………………… 25

**IV. Conclusion**…………………………………………………………………….. 25

////

////

Defendants' Fed.R.Civ.P. Rule 11 Motion for Sanctions

## <u>Table of Authorities</u>

Ca. Bus. & Prof. Code §16200…………………………………………………………..24

<u>Cooter Gell v Hartmarx Corp</u>., 496 US 384, 401-402 (1990)……………………………3

Fed. R. Civ. P. 11(b)……………………………………………………………2, 19, 23-25

Fed R. Civ. P. 11 (c )…………………………………………..……....2, 3, 25

Local Rule 11-9……………………………………………………………………2

Local Rule 83-7………………………………………………………………....2

////

////

////

Defendants' Fed.R.Civ.P. Rule 11 Motion for Sanctions

## <u>Memorandum of Points & Authorities</u>

Defendants Jason Witten ("Witten") and Wang, Hartmann, Gibbs & Cauley, Ltd. ("UK Office") solemnly file this Motion for Fed.R.Civ.P. 11 Sanctions against Plaintiff Wang, Hartmann, Gibbs & Cauley, PLC ("WHGC CA") and its attorneys Richard Cauley ("Cauley"), Jeffrey Wang ("Wang") and any new lead counsel for WHGC CA.

Witten has always refrained from filing a motion such as this due to the gravity of the accusations, and the rights of attorneys and parties to zealously pursue their perceived remedies – whether they are correct or not.  However, as the following substantial written evidence will prove, the Complaint and First Amended Complaint filed and maintained by WHGC CA and its attorneys is beyond the pale of frivolousness.

It all turns on a single former client of WHGC CA retaining the UK Office after a bad experience with WHGC CA.  The entire matter consisted of about £3,000.  All of the causes of action in the First Amended Complaint are trumped up from this single event.  The evidence will show Wang/WHGC CA used this event as an excuse to wrongfully breach his agreement with Witten concerning Witten's ownership and operation of the UK Office.  It was nothing more than an amateurish cover-up for Wang's/WHGC CA's breach of said agreement.

The evidence presented herein conclusively proves that WHGC CA's allegations that Witten secretly converted clients is not just fabricated from whole cloth, but that the attorneys for WHGC CA knew the claims were false at the time of filing them, or grossly failed to conduct a reasonable inquiry prior to filing.  Specifically, WHGC CA's attorneys had all of the evidence in this brief prior to filing, and thus, had no reasonable basis upon which to make its spurious allegations, other than stifle Witten's right to compete after WHGC CA terminated him, and to concoct leverage to dissuade Witten from asserting his own claims for breach of contract, fraud and unfair competition against WHGC CA and Wang.

# I. <u>Legal Standard</u>

Fed.R.Civ.P. 11(b) states:

"By presenting to the court a pleading, written motion, or other paper — whether by signing, filing, submitting, or later advocating it — an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed.R.Civ.P. 11(c) states in relevant part:

(1) If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

   …

(3) On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).

(4) A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

Similarly, L.R. 11-9 states, "Sanctions. The presentation to the Court of frivolous motions or opposition to motions (or the failure to comply fully with this rule) subjects the offender at the discretion of the Court to the sanctions of L.R. 83-7."

Defendants' Fed.R.Civ.P. Rule 11 Motion for Sanctions

Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and "not interposed for any improper purpose." An attorney who signs the paper without such a substantiated belief "shall" be penalized by "an appropriate sanction." Such a sanction may, but need not, include payment of the other parties' expenses.  Although the Rule must be read in light of concerns that it will spawn satellite litigation and chill vigorous advocacy, any interpretation must give effect to the Rule's central goal of deterrence.

Pursuant to <u>Cooter Gell v Hartmarx Corp.</u>, 496 US 384, 401-402 (1990), rather than mandating an inquiry into purely legal questions, such as whether the attorney's legal argument was correct, Rule 11 requires a Court to consider issues rooted in factual determinations. For example, to determine whether an attorney's prefiling inquiry was reasonable, a court must consider all the circumstances of a case. An inquiry that is unreasonable when an attorney has months to prepare a complaint may be reasonable when he has only a few days before the statute of limitations runs. In considering whether a complaint was supported by fact and law "to the best of the signer's knowledge, information, and belief," a Court must make some assessment of the signer's credibility.

Extensive Advisory Committee Notes explain that "the purpose of Rule 11 sanctions is to deter rather than compensate." Rule 11(c)(4) thus contemplates and permits a monetary sanction in the form of a penalty, but such a sanction is now limited to "what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."

## II.  Statement of Facts

*A.  Formation of the Plan for the UK Office was discussed between Wang & Witten*

1.  Wang founded WHGC CA in 1994 as "The Law Offices of Jeffrey Wang".  Witten joined it in 1998.

2.  In or about the Winter of 2007, Witten discussed opening a European based branch of "Wang, Hartmann, Gibbs & Cauley" with Wang.  At that time Wang represented to

3

Witten that he should wait and perhaps they would open a branch in London, England. Witten Decl. ¶3; Ex. A to the Declaration of Jason Witten filed herewith (Ex. A).

3.   In 2008, Witten invested his own money and passed the English Bar Exam becoming a licensed solicitor in England and Wales.  Witten Decl. ¶4.

4.   In or about the Summer of 2009, Witten traveled using his own money to Europe looking at the possibility of opening a UK office.  He reported back in a memo sent on or about July 18, 2009 by email to Wang that some of WHGC CA's current clients had offices in Europe with European needs that WHGC could likely make clients of a UK office, if it were established.  Based upon what Witten saw: 1) The international clients WHGC CA were servicing in the US and Asia also required EU services; and 2) The UK office could fill that need and be profitable.  Witten Decl. ¶5; Ex. B.

5.   In the Summer of 2009, Witten raised with Wang the issue of opening an office of WHGC CA in the United Kingdom (this became the UK Office).  Witten prepared a draft business plan for the UK Office and discussed it with Wang.  Witten Decl. ¶6.

6.   In the Fall of 2009, after reviewing and considering the business plan, Wang on behalf of himself and WHGC CA told Witten that he would allow Witten to open the UK Office. Wang instructed Witten to investigate the variables of having a multi-attorney firm in London.  Witten Decl. ¶7.

*B.  The UK Office Business Plan was Implemented*

7.   On December 23, 2009, Witten finished the business plan incorporating the multi-attorney variable Wang had requested (the "Business Plan").  On the same date, Witten gave the Business Plan to Wang, and another partner of the firm, Franklin Gibbs ("Gibbs"). Witten Decl. ¶8; Ex. C.

8.   The Business Plan stated the following terms:

A.   Regarding ownership of the UK Office:

1)   Witten was to take all of the risk in the UK Office and be its sole owner.

2)   Profits to WHGC CA from the UK Office were limited to the license fee to use the "Wang, Hartmann, Gibbs & Cauley" and "WHGC" marks.

4

Witten Decl. ¶8(A); Ex. C, p. 2, 5, 10.

    B.  Regarding salary for work for WHGC CA:

        1)  Witten was guaranteed for one (1) year to continue to earn his WHGC CA salary by working on WHGC CA files assigned by Wang.  He had to work on these files in addition to his work at the UK office.  Since the venture started in March, 2010, the year would expire at the end of February 28, 2011.

Witten Decl. ¶8(B); Ex. C, p. 2, 5.

    C.  Regarding the kinds of files that would be assigned to the UK Office:

        1)  Selectively supporting WHGC CA's <u>current client base</u> as they develop European business requirements and to develop a new client base.

        2)  Leverage WHGC CA's <u>current business</u> to take advantage of Europe.

        3)  Concentrate on the development of the following areas of business:

            A) International Business Transactions between the US, China and Europe with a focus on bringing clients to China, litigating their commercial disputes, and providing guidance on corporate and commercial matters in these jurisdictions;

            B) Intellectual Property prosecution and litigation in the US, and litigation in the EU and China;

            C) Business litigation in the US and EU, and arbitration in China; and

            D) General business services such as employment issues and corporate guidance on the start-up, growth and sustainability of businesses in the US, China and Europe.

Witten Decl. ¶8(C); Ex. C, p. 4, 5.

    D.  Regarding the License to use "Wang, Hartmann, Gibbs & Cauley" and "WHGC" ("the WHGC marks"), the UK Office had a License to use these marks in exchange for 5% of the UK Office's profits after taxes each year.

Witten Decl. ¶8(D); Ex. C, p. 2, 5, 10.

*C.  Wang, the Alter-Ego of WHGC CA, Authorized Witten To Open the UK Office Pursuant to the Business Plan*

9.  In the Winter of 2009-2010, Wang reviewed the terms in the Business Plan and gave his final authorization to Witten to open the UK office.  Witten Decl. ¶10

10.  Wang was authorized by WHGC CA to make the representation, because Wang is the 99.9% shareholder of WHGC CA and is alter ego of WHGC CA.  At all times herein mentioned there existed a unity of interest and ownership between Defendant Wang and Defendant WHGC CA, such that any individuality and separateness between Defendant Wang and WHGC CA has never existed, and Defendant WHGC CA is the alter ego of Defendant Wang.

11.  In fact, in or about 2010 Wang and WHGC CA stipulated and admitted to Wang being the alter-ego of WHGC CA in the case entitled <u>Pumilia, Patel & Adamec, LLP vs. Wang, et al</u> filed in Los Angeles Superior Court, Case No. BC399158.  Witten Decl. ¶12; Ex. D.  In the motion entitled "Defendant/Cross-complainant's Motion in Limine (To Exclude Evidence of the Ownership Structure and Financial Condition and Operation of WHGC)", Wang admits that:

 A.  Wang is the alter-ego of WHGC CA;

 B.  Wang owns 99.9% of WHGC CA;

 C.  Of the 10,003 shares in WHGC CA, Wang owns 10,000;

 D.  Wang promotes Hartmann as a name partner at WHGC CA even though Hartmann runs his separate law office, The Hartmann Law Firm out of the same offices as WHGC CA, and is not connected with WHGC CA in any way other than in name only.  This is also supported by Hartmann's own California Bar profile.  Witten Decl. ¶12; Ex. E.

12.  Related to the foregoing, Wang holds an attorney, John Van Loben Sels out as a partner in WHGC CA.  Witten Decl. ¶13; Ex. F.  However, if Wang owns 10,000 of the outstanding shares of WHGC CA, and Hartmann, Gibbs and Cauley collectively own 3 shares as set forth in the above motion, that means that Wang has not issued any shares to

Van Loben Sels.  Witten Decl. ¶12; Ex. D.  Thus, Wang is causing WHGC CA to mislead the public as to Van Loben Sel's position in WHGC CA, similar to what he does with Hartmann.

13.  Further, Witten has been with WHGC CA for twelve (12) years, and personally knows that Wang is the alter ego of WHGC CA.  For example, WHGC CA claims to operate an office in Taiwan and an office in Beijing, but in fact has no attorneys in either alleged office.  Rather, it is an illusion created by Jeffrey Wang to make potential and existing clients believe he has a presence in those countries when he does not.  Close scrutiny of WHGC CA's website reveals that there are no WHGC CA attorneys working out of the China and Taiwan offices, and there are no WHGC CA attorneys even licensed to practice law in China.  Further, that in order to perpetuate this fraud, Wang has lied on forms to the Chinese government stating that Witten would be stationed in the China office.  Witten Decl. ¶14; Ex. G.

14.  Further, that Wang, likely in violation of professional ethics, shares client fees with a Taiwan attorney named George Chen, such that he has paid George Chen a set percentage of the fees he receives from clients that George Chen refers to Wang on a regular basis.  Witten Decl. ¶15.

15.  Moreover, that none of the "partners" in WHGC CA have any independent authority.  Wang wields all authority over them and threatens to fire them whenever they disagree with him.  All of them have come up for firing in the last two (2) years for a variety of reasons that change with Wang's mood.  Witten Decl. ¶16.

16.  Further still, that Wang operates a secret company, International Business Advisory Group, Inc. ("IBAG") out of the same office as WHGC CA's Newport Beach address.  This company apparently operates an Employee Stock Ownership Plan for four to seven (4-7) employees, though it is a mystery as to who they could be, since WHGC CA is certainly not owned by its employees.  Further, Witten was employed at this address for years and there is no discernable corporate activity for IBAG there.  Accordingly, it must derive its income from WHGC CA in some manner.  Witten Decl. ¶17; Ex. H.

17.  In fact, Wang causes IBAG to purchase office equipment that Wang interchanges with WHGC CA.  In fact, the computer Wang issued to Witten at WGHC CA that contains attorney client and attorney work product privileged information is registered to IBAG, and is believed to owned by IBAG.  The propriety of which appears dubious.  Witten Decl. ¶18; Ex. I.

18.  In sum, Wang has stipulated in open court that he is the alter ego of WHGC CA and the facts support it.  Moreover, Wang owns 99.9% of WHGC CA.  Accordingly, when Wang authorized Witten to open the UK office, it was binding on WHGC CA.

D.  *The Business Plan was Performed*

19.  Witten and Wang spoke about the details of the Business Plan from time to time up through the end of February, 2010.  Witten requested of Wang that they have a written contract to confirm what the plan was for the business.  Wang simply stated on several occasions that Witten could run it how he wanted.  Wang last stated this on February 26, 2010, the last workday before Witten left for England to start the UK Office.  Witten Decl. ¶19.

19.  Since Wang had left the terms of Witten's control of the UK Office quite broad, Witten confirmed in a March 1, 2010 email to Wang that Witten would run the UK Office as it had been set forth in the Business Plan Wang had agreed to.  Witten Decl. ¶20; Ex. J.

20.  Wang never refuted this.  Based on the foregoing actions and representations by Wang, Witten moved his wife and two small children to England and began performance. Based on the preliminary memo (Ex.B), the Business Plan (Ex. C), Wang's representation, Witten's October 1, 2010 email (Ex. J), and the parties' performance, the terms of the Business Plan constituted the "Agreement" and Witten followed it.  Witten Decl. ¶21.

21.  As was further set forth in Witten's March 1, 2010 email, upon arriving in England Witten immediately began the task of incorporating the UK Office, formally entitled "Wang, Hartmann, Gibbs & Cauley, Ltd."   Witten invested his own hard earned money in the "WHGC marks", and took a tremendous risk in opening the UK Office. Witten Decl. ¶22; Ex. J.  On April 27, 2010, the UK Companies House issued the UK

Office's Certificate of Incorporation.  Witten Decl. ¶22; Ex. K.   On or about May 4, 2010, Witten emailed the Certificate of Incorporation from the UK Companies House for Wang, Hartmann, Gibbs & Cauley, Ltd. to Wang.  Witten Decl. ¶22.

22.  Further, pursuant to the plan for the UK Office to service WHGC CA's current clients' needs in the EU, in the latter half of March, 2010, once the UK Office had a physical address, Witten contacted several select clients informing them of the new UK office.  Witten is informed and believes and thereon alleges that he carbon copied Wang on some or all of these emails.  Wang and Witten would talk on occasion of this as well. Witten Decl. 23.

23.  Moreover, as set forth in the Business Plan, Witten continued to draw his guaranteed salary from WHGC CA for the work that he did that he billed through WHGC CA; submitting monthly timesheets to WHGC CA management.  Witten Decl. ¶24.

24.  In addition, Witten returned to California in April, May and August, 2010, and in June, 2010 met Wang in China for work over 10 days, to support WHGC CA with his physical presence, and to appear for a critical hearing for a client in May, 2010 in LASC. Witten Decl. ¶24.

*E.  Wang Reveals that He Does NOT want the UK Office to Succeed*

25.  During the trips, above, Wang commented he hoped the UK Office would fail so that Witten would return to WHGC CA full time.  Indeed on Witten's last trip in August, 2010, Wang's comments got very serious.  Witten reminded Wang that, as set forth in the Agreement, he had at least a year to try to get the UK Office up to where it could support his salary and to see if it worked.  At the end of the year, WHGC CA could terminate his salary and Witten could tough it out on his own at the UK Office, or he could physically return to WHGC CA.  Wang did not deny that this was the Agreement.  Witten Decl. ¶24.

*F.  The UK Office Handles its First WHGC CA Client Needing EU Services According to the Business Plan*

26.  Backing up a little in time, at the end of June 2010, Witten was forwarded a lead on a new matter from a partner at WHGC CA in the form of an email from Client "S"

stating that it specifically needed the services of an EU firm, and wanted to talk to the UK Office. Witten Decl. ¶25; Ex.L. The partner who forwarded the lead, Van Loben Sels, was Client S's primary attorney at WHGC CA. This matter involved EU trademark law and Dutch Customs. This was exactly the kind of case the UK Office was started for: a current client that needed an EU firm to handle an EU legal issue – a matter that WHGC CA could never before get. Witten communicated with Client S to win its business specifically stating it would be retaining the UK Office, and Van Loben Sels was carbon copied on this email. Witten Decl. ¶25; Ex. M.

27. When Client S sent, via email, the UK Office's executed engagement agreement and bank wire receipt, it was sent to Witten as well as Van Loben Sels and a paralegal to Wang, who sits right outside Wang's office, Halai Hashimi ("Wang's Paralegal"). Wang's Paralegal forwarded it to WHGC CA's lead paralegal, Faiza Anwar ("Office Manager 2"), who has office management duties directly under WHGC CA's head office manager, and Office Manager 2 forwarded it to WHGC CA's head office manager, Wang's wife, Elaine Wu ("Wu"). Witten Decl. ¶26; Ex. N. Thus, it was fully disclosed at every level: partner, office manager and paralegal, that it was the UK Office that had been retained and had issued bank wire instructions, because that is what Client S wanted and required, and that was the purpose of the UK Office pursuant to the Agreement. WHGC CA had in its possession the UK Office's Engagement Agreement and bank wire information to the UK Office's bank.

28. On or about June 24, 2010, Office Manager 2 asked how the file and retainer for Client S's matter should be handled. Witten told her and Wu it was a UK Office matter to be handled by the UK Office. Witten further explained that Van Loben Sels' time should be billed to the UK Office on the project, if any, and the UK Office would be responsible for it. Witten Decl. ¶27; Ex. N. Office Manager 2 followed up with Witten stating that Wu wanted any money forwarded into a foreign currency account. Witten told her that he would be happy to send payment on any bill for Van Loben Sels' time to that account. Witten Decl. ¶27; Ex. O. A week later, on June 30, 2010, after the matter was successfully

concluded, Wu emailed Witten about sending her the money solely for tax reasons. Witten told her the matter was completed, and the Van Loben Sels' time was nominal, if any, thus there were no tax issues for WHGC CA. Witten Decl. ¶27; Ex. P. That was the end of the matter. Indeed, Witten was in WHGC CA's Newport Beach office for almost 2 weeks in August, 2010 spending a lot of time with Wu and Wang, and the issue never came up at all. Witten Decl. ¶27.

29. In September 2010, things took a turn for the worse. On September 9, 2010, Witten was informed that Wang was acting erratically and beginning to plot as to how to have Witten return to WHGC CA and abandon the UK Office. Further, that Wang was reminded that Witten had a year to get the UK Office up and running before WHGC CA cut-off work to Witten, effectively cutting-off Witten's income from WHGC CA, but that Wang was growing increasingly irrational, beginning to deny that there was any Agreement, simply because he had not signed anything. Witten Decl. ¶28.

30. On September 10, 2010, Wang asked Witten if he had forwarded Client S's money for the EU issue to WHGC CA. Witten explained the same thing to Wang as Witten had to Van Loben Sels, Wu and Office Manager 2 two and a half months earlier, as set forth, above, and then heard nothing. Witten Decl. ¶28; Ex. Q.

G. *Wang Sets in Motion His Plan to the Breach of the Agreement*

31. On September 16, 2010, Wang had another name partner at WHGC CA, Gibbs, write Witten an email stating that the UK Office had no future, that Wang was worried that the UK Office's services in the EU would incur liability for WHGC CA that WHGC CA was not insured to cover, and urging Witten to immediately abandon the practice and return to WHGC CA full time. Witten Decl. ¶30; Ex. R.

32. On September 16, 2010, Witten immediately responded that returning to California was not feasible, that the worries were misplaced, and that the Agreement between Witten and Wang on behalf of WHGC CA required that Witten had a guaranteed year of salary and a year to get the UK Office up and running. Witten Decl. ¶31; Ex. R.

33.  It is at this point, on September 17, 2010, more than six (6) months after Witten had moved to England, that Wang for the first time expressly stated in an email his intent to repudiate the Agreement regarding Witten's salary.  Witten Decl. ¶32; Ex. R.

34.  On September 18, 2010 UK time, Witten immediately emailed Wang back expressing his shock at Wang's repudiation.  Witten Decl. ¶33; Ex. R.

35.  On or about September 20, 2010, Witten and Wang spoke on Skype face to face attempting to settle their differences.  When face-to-face, Wang said that he would drop his wrongful demand for the money the UK Office made on the Client S matter.  Further, Wang rescinded his repudiation of the Agreement between the parties as set forth in paragraph 34, above.  Rather, he stated that because WHGC CA's insurance would have been too expensive  to insure Witten for both US and EU work, Witten was to become "of counsel" to WHGC CA, and his name would be removed from WHGC CA's website.   Wang represented that he would continue to have Witten work on his existing files as an independent contractor at set amount per hour.  Witten Decl. ¶34; Ex. S.  Wang instructed Gibbs to confirm this in an email to Witten, which Gibbs did.  Witten Decl. ¶34; Ex. S.

36.  On September 21, 2010, Witten discovered that Wang's alleged worry about insurance coverage for Witten's EU work was not true.  Specifically, to test Wang's representation, Witten sent Wang and Wu an email informing them that Client "E" had an issue involving their distributors in the EU who were using Client E's trademark, and that Client E needed counsel regarding EU trademark law to get them to stop.  Wu wrote back the same day, carbon copying Wang, stating that Witten should handle the matter through WHGC CA.  Witten Decl. ¶35; Ex. T.   However, according to Wang's previous representation, WHGC CA was not insured to cover this type of work.  Witten Decl. ¶35; Ex. R.

37.  Therefore, insurance had nothing to do with the reason Wang changed Witten to "of counsel" status and removed him from the website.  Between this and the issue with Client S, clearly all Wu and Wang cared about was circumventing the UK Office and

making all the money from the opportunity the UK Office had created.  They were pushing Witten out because of greed.  This was a complete breach of the Agreement.

38.  As part of the "of counsel" arrangement, Wang instructed Witten to send a list of his active files to Gibbs with estimates of time for work to be completed.  Wang represented that Gibbs and Wang would manage the flow of work to Witten.  Witten followed the instruction.  Witten Decl. ¶37.

*H.  Wang Begins to Compromise Clients' Rights in Order to Damage Witten*

39.  One of the major projects to be completed over September and October, 2010, was for Witten to file a Motion for Default Judgment worth approximately $2,000,000 for WHGC CA's Client "D".  When Wang learned of this, Wang told Gibbs that a principal of Client D instructed him to not pursue the Motion for Default Judgment and to terminate the case immediately. He had Gibbs email Witten with the instruction to cease all work and terminate the case.  Witten Decl. ¶38; Ex. U.

40.  Witten was shocked at this instruction and emailed the President of Client D to confirm.  In two (2) emails, the President and Vice-President of Client D vehemently denied ever making such an instruction; asking Wang what kind of "games" he was playing. Witten Decl. ¶39; Ex. V.

41.  It was clear that Wang had lied about this client instruction, a lie that would have cost Client D $2,000,000.  That is when it became apparent to Witten that Wang was intent on having WHGC CA breach the Agreement.

42.  On September 30, 2010, Witten received an email from Gibbs stating which files Witten would continue working on.  Missing from the list were three (3) clients that Witten was in the middle of providing services for, and two (2) clients that Witten had brought in for WHGC CA.  Witten Decl. ¶41

43.  Specifically, the following salient issues required client consent in order to take Witten off their case:

A.  Client "T adv. C".  Wang instructed Witten to lead the settlement of this case and that is what Witten had done.  This was at the end of the case and Witten was in delicate

negotiations of the settlement documents with opposing counsel.  It was not prudent to be removing Witten from this case at this time.  He only had about ten (10) more hours of work left on it, at most, over the next week or two.

B.  Client "C".  Witten had signed this client to WHGC CA.  Witten was the primary attorney assigned to it.  The principal of Client C contacted Witten when he had a question or further work.  The principal had just instructed Witten to prepare a loan agreement for him related to an investment structure for one of his investors that Witten was up to speed on.  Witten offered to forward to Gibbs Client C's instruction for Witten to prepare the loan agreement and prepare corporate minutes to reflect the investment structure.  The instruction was clear.  The work only amounted to about eight (8) hours a month of work, and would have likely ended shortly since the business Witten had incorporated for Client C was almost up and running.

C.  Client "TMB".  Witten signed this client to the firm as well.  It was corporate formation work and commercial contracts which were the reasons Witten was asked to land Client TMB.  Further, the principal of Client TMB was from Witten's hometown of Huntington Beach, they knew the same people, and they went to the same church.  It was only likely to be about twenty (20) hours of work.

D.  Client "C adv. L".  Witten had been Client C adv. L's attorney since 2005.  Witten was at the end of his litigation matter that had thirty (30) years of facts and five (5) years of litigation history.  Witten won an interlocutory Order for him in 2007 after a week-long bench hearing/trial.  After 5 years of litigation, it was well know that the client was extremely adverse to changes in his case.  The work remaining included signing deeds pursuant to a partition in kind of real property, and finalizing the interlocutory Order into a final judgment that included an accounting that had been completed, but needed to be updated.  After that, there was an issue of costs, and a CCP §998 offer made in 2007 that would come into play.

Witten Decl. ¶42; Ex. W.

44. On September 30, 2010, Witten sent an email to Gibbs suggesting he reconsider taking away these clients without the clients' consent by emphasizing the foregoing reasons. Despite this admonishment, on October 1, 2010, Gibbs replied by email that Witten would not be placed back on these cases. Witten Decl. ¶43; Ex. W.

45. These clients were never informed of their right to choose Witten as their counsel. They were treated like chattel and instructed that their file would be handled by a different attorney within WHGC CA. Witten Decl. ¶44. This was a clear violation of the ethical duty to inform the clients that they had a choice of which attorney to have work on their case, as discussed in Cal. Bar Ethics Op. No. 1985-86.

46. Wang was now violating client rights to destroy Witten by denying him access to any income and to any clients, wherever possible.

I. *Wang Concocts a Controversy to Cut-Off Witten from Clients*

47. On October 30, 2010, Wang breached the attorney client and work product privileges between the UK Office's clients and Witten. Wang knew Witten handled all of his email for the UK Office on WGHC CA's email server. Wang broke into Witten's email and read the bills the UK Office had sent its clients. One of the bills was to the UK Office's Client "TI" for about £2,414. Wang conspired with his office manager, and wife, Wu, to prepare a fraudulent invoice to Client TI. Specifically, Wang and Wu prepared an invoice from WHGC CA that copied Witten's time entries from the UK Office and reissued it as an invoice from WHGC CA. Wang and Wu then caused it to be emailed to Client TI with instructions to pay WHGC CA instead of the UK Office. Witten Decl. ¶46; Ex. X. Of course, Wang, Wu and WHGC CA attempted to conceal their wrongdoing by not sending a copy of the email to Witten. Witten Decl. ¶46.

48. Further, Wang instructed Gibbs to prepare a letter to Client TI, stating that they would be happy to come to Client TI for a meeting. Witten Decl. ¶47; Ex. X. There was no mention to Client TI that it had a choice to come with Witten. Cal. Bar Ethics Op. No. 1985-86.

49.  On Saturday, October 2, 2010, Witten was informed by Client TI of WHGC CA, Wang and Wu's wrongful issuance of the fraudulent invoice and the fraudulent letter. Witten Decl. ¶48.

50.  It was at this point that Witten realized that WHGC CA had, without prior notification to Witten, cut-off Witten's access to the firm email, including the email used by the UK Office, completely cutting off all email communications with <u>all</u> of the clients to whom Witten was providing services. In addition, Wang cut-off Witten's WHGC CA cell phone account effectively making it impossible for WHGC CA clients to contact him, since they did not know his UK Office telephone number. Further, Wang had instructed Richard Cauley ("Cauley"), another partner at WHGC CA, to falsely accuse Witten of converting Client TI from WHGC CA; even demanding disgorgement of any moneys paid by Client TI, and attempting (without success) to impede the UK Office from carrying on business with the WHGC marks, in a blatant breach of the license component of the Agreement. Witten Decl. ¶49; Ex. Z.

51.  The allegations by Defendants related to Client TI were completely false.  Witten immediately responded over two (2) emails, discussing Witten's and the UK Office's relationship with Client TI, informing WHGC CA that Client TI was not a client of WHGC CA with supporting emails from Client TI itself confirming the same.  Specifically, Client TI had not been of client of WHGC CA for some time due to a bad experience Client TI had with WHGC CA management over eighteen (18) months prior.  Witten was able to win Client TI's business back, but only on Client TI's instruction that it be a client of the UK Office.  Client TI wanted nothing more to do with WHGC CA.  The last work Client TI had WHGC CA do after its bad experience eighteen months earlier, was some emergency work that coincided with Witten's leaving to open the UK Office in February/March, 2010. Client TI wanted Witten to handle the matter through the UK Office, but it had not been established yet.  Since it was an emergency, Witten informed TI that he would handle it through WHGC CA, and after that, Client TI informed Witten that it did not want any further matters handled through WHGC CA.  As such, Witten had not converted a client of

WHGC CA.  If WHGC CA or Cauley had done any investigation before making such a preposterous claim, they would have known better.  Witten put Cauley on notice of these facts and instructed WHGC CA to cease interfering with the UK Office's clients, as well as to cease reading the privileged and confidential email between the UK Office and its clients. Witten Decl. ¶50; Ex. AA.

52.  On October 4, 2010, due to Wang's/WHGC CA's wrongful acts, Witten had no functioning company email or cell phone.  Therefore, Witten established a new email address "@whgc-uk.com" to communicate with clients in compliance with Ca. RPC 3-500. He informed Wang of this new email address on October 5, 2010.  Witten Decl. ¶51.

*J.  WHGC CA Authorizes Witten To Conduct Business Using WHGC Marks While Secretly Filing The Frivolous Complaint*

53.  On October 5, 2010, Wang caused Cauley to file the sanctionably frivolous Complaint in this action falsely alleging that the UK Office was a secret Witten kept from WHGC CA, that Witten was converting clients, and that therefore Witten was infringing WHGC CA's trademark.  Witten Decl. ¶52.

54.  On October 5, 2010, Witten was contacted by Client E at this new "whgc-uk" email address with critical work to be performed.  Witten informed Wang and Gibbs of this in two (2) emails during business hours before contacting the client.  Wang and Gibbs never responded.  Witten contacted Client E and explained the situation.  Client E issued instructions to Wang and Wu for Witten to work on the file.  Witten waited until the next day, October 6, 2010 to undertake the work giving Wang and WHGC CA time to object. They did not object, and Witten performed the work.  Witten Decl. ¶53; Ex. BB.

55.  Further, on October 5, 2010, Cauley instructed Witten to participate in a two (2) hour meeting with clients to take place on October 6, 2010, and Witten did so.  Witten Decl. ¶54; Ex. CC.

56.  As such, Wang/WHGC CA had filed a completely specious and frivolous Complaint full of lies about Witten and the UK Office, all the while hiding this from

Witten, and yet were authorizing Witten to work on files for WHGC CA and instructing him to hold himself out as WHGC CA to clients.

57.   On October 7, 2010, Witten received a letter from Cauley stating that Witten was no longer "of counsel", and the use of the WHGC marks was no longer permitted.  It mentioned nothing of the lawsuit.  It was a full, complete and final breach of the Agreement, costing Witten $58,000 in salary and the loss of the WHGC marks.  Witten Decl. ¶56.

58.   Witten had no desire to be a part of WHGC CA any more and immediately ceased use of the WHGC CA's marks on October 7, 2010.  Witten Decl. ¶57; Ex. DD.

59.   Based on the foregoing, it is clear that Wang never wanted the UK Office to succeed, and when faced with its success, set in motion a wrongful course of action to destroy Witten, including the filing of the present frivolous action.

60.   Witten was informed of the Complaint in this action by a reporter on October 9, 2010.  WHGC CA had tried to keep it secret.  Witten immediately began detailed settlement negotiations with Cauley at WHGC CA who had been designated to act for it.  Witten Decl. ¶59.

K.  *The Parties Enter a Settlement Agreement*

61.   In anticipation of this Rule 11 Motion, Witten put Cauley and WHGC CA on notice of the foregoing facts in an October 12, 2010 settlement communication.  Witten Decl. ¶60.

62.   Cauley is the senior litigator at WHGC CA.  He has been handling civil litigation for approximately 30 years.  He is a graduate from University of Michigan Law School, and before becoming a name partner at WHGC CA several years ago, he was a partner at the national law firm of McDermott, Will & Emory. Witten Decl. ¶61; Ex. EE.

63.   As a partner in WHGC CA, and as its attorney (representing itself), on October 15, 2010, Cauley made a "firm and final" written settlement offer to Witten and the UK Office.  Witten Decl. ¶62.

64. On October 20, 2010, Witten and WHGC UK unequivocally accepted the settlement offer in writing.  Witten Decl. ¶63.

65. Witten has filed a Motion to Enforce Settlement Agreement concurrently herewith.  It has been filed under seal due to the confidential nature of the motion.  For the sake of efficiency Witten expressly incorporates it herein.

66. On or about October 21, 2010, WHGC CA and Cauley signed and caused to be filed the First Amended Complaint.  Nobody informed Witten of this.  Witten found it while reviewing the docket for this matter on PACER on October 25, 2010.  Witten Decl. ¶63.

67. On or about October 30, 2010, <u>Cauley, on full notice of the frivolousness of his pleadings in this action, abandoned his prosecution of this action</u> and Witten is informed and believes that Wang forced Van Loben Sels through improper coercion unrelated to the merits of this action to become the attorney handling it.  Witten Decl. ¶64; Ex. FF.

## II. Discussion

### A. Settlement Agreement

As set forth in the concurrently filed Motion to Enforce Settlement, the parties conclusively entered a settlement agreement on October 20, 2010.  Facts 60 – 65, above.  Cauley and WHGC CA knew there was a settlement at the time they filed the First Amended Complaint, and yet they still filed it knowing it was frivolous.  Thus, they knowingly filed a frivolous pleading in violation of Fed.R.Civ.P 11(b).  They have failed to withdraw the offending pleading, and as such are subject to sanctions.

### B. Breach of Fiduciary Duty

The Complaint and First Amended Complaint contain conclusory statements trying to attach a fiduciary duty reserved for law firm partners.  The reason they have to do this is because, despite numerous representations to the contrary, Wang never actually made Witten a partner.  First Amended Complaint ¶12, 40-42.  Had Wang made Witten a partner, these conclusory statements would not be necessary.  WHGC CA cannot have it both ways.

Wang failed to make Witten a partner despite Wang's numerous misrepresentations to the contrary and therefore no fiduciary duty exists.

Further, even if there were a fiduciary duty owed, Witten did not undertake any wrongful activity in breach of it.  As best as can be gleaned from the vague Complaint and First Amended Complaint, the factual basis for the claim for breach of fiduciary duty is set forth in paragraph 44, which states:

> "Witten breached his fiduciary duty to WHGC by negligently, deliberately, intentionally and/or recklessly disregarding the rights of WHGC and failing to perform his obligations to WHGC, and using WHGC's trademarked name and logo to appropriate WHGC's existing clients and to market Witten's legal services to other clients in direct competition with WHGC."

Prior paragraphs in the First Amended Complaint are all one has to interpret this vague pleading.  The prior paragraphs essentially state that:

1) Witten was secretly billing WHGC CA's clients from the UK office without WHGC CA's consent.  First Amended Complaint ¶¶21-24.  However, WHGC and Cauley knew this was untrue at the time of filing:

A)  Witten disclosed the business and banking relationship of the UK Office to WHGC CA prior to leaving for the UK, and then after he was in the UK in regard to Client S.  Facts 8, 19-21, 26-28.

B)  Further, Witten did not convert Client TI or any other client from WHGC CA.  Facts 47-51, above.

C) The Business Plan clearly states that the UK Office would handle matters for existing WHGC CA clients with needs in EU.  Further, that it would solicit new clients from around the world for work in the US and EU.  This was fundamental to the viability of the UK Office.  Further, at the end of the year, Witten would not be drawing a salary from the WHGC CA, and there is certainly no allegation that he was going to give-up his US practice.  Indeed, the facts draw the opposite conclusion.  Witten was going to operate in 2 jurisdictions, handling US matters, sometimes with WHGC CA where appropriate, and handling EU matters.  Facts 8, 19, 20, 21.  Based on this, Witten was authorized to open the

UK Office, and Witten confirmed it in his email to Wang on March 1, 2010.  Facts 20, 21;
and

2) That Witten was to bill all of the UK Office's clients through WHGC CA.  This
claim is absurd:

A) Witten invested his own hard earned money in the "WHGC" name, and took
a tremendous risk in opening the UK Office.  WHGC invested nothing and paid none of the
overhead.  Facts 8(A), 21.

B) The Business Plan states that the only sums to WHGC CA are the licensing
fees for the use of the WHGC CA marks.  Fact 8(D).

C) The Business Plan clearly states that the UK Office was to become self-
sustaining and turn a profit within one (1) year and Witten was to lose his US salary at the
end of that year.  Ex. C, p. 2, 5, 9, 10.  Thus, the UK office would have to make a profit to
support Witten.  Facts 8(B), 23, 24 & 25.  It could not do this if it was sending all of its
clients and money to WHGC CA.

D) The Business Plan shows projected profits to itself on pages 9 & 10.  Ex. C.

E) When Wang said Witten could run the UK office as he saw fit, Witten said he
would run it according to the Business Plan, to no objection by Wang, and Witten ran it as
such.  Facts 20, 21; Ex. J.

F) The Client S matter noted above wherein billing practices and bank accounts
were fully disclosed to every level of WHGC CA, irrefutably prove that Witten disclosed
what he was doing and operating the UK Office just as set forth in the Business Plan.  Facts
27, 28 & 35.

G) WHGC CA's preposterous claim that all money was to go to WHGC CA
would have constituted illegal fee sharing where the UK Office retained the clients and did
all the work, but paid WHGC CA an unearned fee.  Cal. RPC 2-200; England's Solicitor's
Code of Conduct Rules 8 & 9.  Witten Decl. 65; Ex. GG.

H) There is not a single writing anywhere to support WHGC CA's claim that all
of the UK Office's income was to go to WHGC CA.  In fact, a perfect example proving the

opposite is the issue discussed above regarding Client S.  Witten handled that matter through the UK Office, fully disclosed what was going on, and WHGC CA did not require the return of any money, or present any argument that it was entitled to it.

Thus, Witten did exactly what he was said he was going to do, and was authorized to do.  He did nothing secretly, he disclosed everything, he converted no clients or money, and he did not violate any trademark rights.

WHGC CA, Wang and Cauley knew this when the Complaint and First Amended Complaint were filed based on writings in black and white contemporaneous with the events they record that were provided to them.  No amount of investigation could have supported an alternate theory, and apparently no reasonable investigation was undertaken.  However, they still filed the pleadings making the frivolous claims for breach of fiduciary duty, and any new lead counsel for WHGC CA continues to maintain this pleading today, even though he is on notice that it is frivolous.

## C.  Fraud/Conversion/Unfair Competition/Declaratory Relief

The causes of action for fraud, conversion and declaratory relief are all based on the same vague and unsupportable facts as breach of fiduciary duty.  First Amended Complaint ¶¶51, 54, 60, 61, 68, 73.  In addition, in the fraud cause of action there is an equally vague claim that Witten failed to keep WHGC CA's secrets.  First Amended Complaint ¶¶53, 54.

However, the same facts that demonstrate the frivolousness of the cause of action for breach of fiduciary duty are applicable to these causes of action.  WHGC CA and Cauley knew the claims were untrue at the time of filing and could not have undertaken a reasonable investigation.  Witten gave WHGC and Cauley proof in writings contemporaneous with the events irrefutably evidencing the blatant falseness of the allegations in the Complaint and First Amended Complaint.

Moreover, fraud requires a misrepresentation or concealment that cannot be established here.  Witten did exactly what he was said he was going to do, and was authorized to do.  It was in black and white from the preliminary memo, to the Business Plan, to the way Client S's matter was handled.  Facts 2-9, 19-21, 26-28, 35.

Witten did nothing secretly, he disclosed everything, he converted no clients or money, and he did not violate any trademark rights.

As to the allegation in the fraud cause of action regarding WHGC CA's secrets, no specific or general secrets alleged to have been disclosed are plead anywhere in the Complaint or First Amended Complaint.  It is impossible to ascertain what WHGC CA is pleading.  However, Witten never disclosed any secrets about WHGC.  Witten Decl. ¶ 66.

Nor is there any way that disclosure of any secrets could be construed as fraud. Witten entered the employment contract twelve (12) years ago and has been adhering to it since then.  Assuming *arguendo* that a secret was disclosed (and none was), it would have been recent.  That would not be fraud though, because the employment contract was adhered to for twelve (12) years.  Rather, that would just be breach of contract.

As such, there is no conceivable misrepresentation attributable to Witten under a theory of fraud.

WHGC CA and Cauley have been on notice of these facts at the time they filed the Complaint and First Amended Complaint.  Thus, they knowing filed a frivolous pleading for Breach of Fiduciary Duty, Fraud, Conversion/ Embezzlement, Unfair Business Practices and Declaratory Relief in violation of Fed.R.Civ.P 11(b).  They have failed to withdraw the offending pleading, and as such are subject to sanctions.

*D. Trademark Infringement*

As set forth above, Witten and the UK Office had a license to use the WHGC marks.  Facts 8(D), and 19 – 21.  Further, that WHGC CA had express knowledge of the UK Office's use of the WHGC marks on engagement agreements, emails and bank accounts with regard to Client S.  Fact 27, above.  Moreover, that the marks would be used for the UK Office's bank accounts, engagement agreements and correspondence with clients.  Facts 8, 9, 19, 21, above.

Cauley's instruction to Witten on October 1, 2010 to stop using the WHGC marks was invalid in light of: 1) The fact Witten had done nothing wrong with regard to Client TI, which Cauley was on notice of. Facts 47-51, above; 2) WHGC CA's permission for Witten

to use the WHGC marks later the same week.  Facts 52, 54 & 55, above; 3) The limited use of the mark WHGC marks solely in the "whgc-uk" email address for the fundamental Ca. RPC 3-500 purpose of providing a way for clients to contact Witten after Wang shut off Witten's email and cell phone. 50, 52 & 54, above; and 4) Witten's discontinuance of use of the WHGC marks on October 7, 2010.  Fact 58.

The foregoing irrefutable evidence is that Witten did not violate any trademark rights.  Further, that WHGC CA did not suffer any damages.

Cauley, Wang and WHGC CA knew this at the time they filed the Complaint and First Amended Complaint.  Thus, they knowing filed a frivolous pleading in violation of Fed.R.Civ.P 11(b).  They have failed to withdraw the offending pleading, and as such are subject to sanctions.

Indeed, it appears that WHGC CA has included this cause of action for the sole purpose of retaining Federal jurisdiction of this matter.  The only dollar amount of £2,414 referenced in the First Amended Complaint clearly would not be enough for Federal jurisdiction even under the most imaginative pleading.

*E.  Summary*

WHGC CA/Wang's pleadings are not just frivolous, but now that Witten is no longer with WHGC CA, wrongfully intended to restrain Witten's ability to compete.  Bus. & Prof. Code §16200.  Wang is telling clients that he has sued Witten in an attempt to dissuade them from choosing Witten's services.  Witten Decl. ¶67.  It seems Wang became filled with fear over the UK Office becoming successful, such that Witten would no longer be the prolific fee earner he had been for WHGC CA over the dozen years he worked for WHGC CA.  Thus, Wang caused WHGC CA to breach the Agreement with Witten over £2,414 in fees from a UK Office client that did not like WHGC CA.  Wang then became paranoid about Witten's ability to now compete against WHGC CA and concocted the frivolous Complaint and First Amended Complaint, attempting to destroy Witten.

However, the Complaint and First Amended Complaint are complete contrivances, wholly unsupported by fact, and intended to thwart competition.  They are the definition of

a frivolous pleading, and a pleading filed for improper purposes.  Fed.R.Civ.P 11(b).
WHGC, Cauley, Wang, and now Van Loben Sels know it.

Although Cauley has wisely been able to remove himself from this matter and
Wang has forced it on Van Loben Sels, they have all failed to withdraw the pleading, and
are all subject to sanctions.

Witten is handling this matter himself, and thus has no attorneys' fees for the Court
to impose as sanctions on the offending filers.  However, Witten has spent, and will spend
approximately 50 hours on this Motion that he would have been billing clients for at $400
per hour ($20,000), travel costs from London to Orange County in the amount of $2,000 for
the hearing, filing fees and costs in the amount of $1,000. Witten Decl. ¶68.

Thus, pursuant to Fed.R.Civ.P 11(c), Witten respectfully requests the Court issue
sanctions against WHGC CA, Cauley, Wang (since he is the alter-ego of WHGC and
clearly responsible for this) and any new lead attorney for WHGC CA, including any of the
above amounts it deems appropriate, plus any amount the Court deems reasonable to act as
a deterrent, and dismiss WHGC CA's frivolous suit with prejudice.

## III.  Compliance with The Safe Harbor Rule

Pursuant to Fed.R.Civ.P 21(c)(2), this Motion, Proposed Order, the Declaration of
Jason Witten, and the supporting documents were served by email and courier on WHGC
CA at least twenty (21) days before filing of the Motion.  Witten Decl. ¶69.

## IV.  Conclusion

Wherefore the premises considered, Defendants Witten and Wang, Hartmann,
Gibbs & Cauley, Ltd. respectfully request this Court Gant this Motion, sanction Plaintiff
and its attorneys Cauley, Wang and any future lead attorney for WHGC CA in an amount to
act as a deterrent, and dismiss the First Amended Complaint with prejudice.

Respectfully Submitted,

Dated: 11/5     , 2010

WITTEN LAW, LTD.

Jason B. Witten
Attorney for Defendants

Defendants' Fed.R.Civ.P. Rule 11 Motion for Sanctions

PROOF OF SERVICE

WANG, HARTMANN, GIBBS & CAULEY, PLC V. JASON BRIAN WITTEN, ET AL.

USDC-CENTRAL CASE NO.: SACV10-1499-JVS (MLGX)

COUNTY OF BERKSHIRE, ENGLAND

  I am employed in the County of Berkshire, England. I am over the age of 18 and not a party to the within action. My business address is Blackwell House, Guildhall Yard, London, EC2V 5AE, England.

  On November 6, 2010 I served the foregoing document described as:

**DEFENDANTS' WITTEN AND WANG, HARTMANN, GIBBS & CAULEY, LTD.'S NOTICE OF MOTION AND MOTION FED.R.CIV.P.RULE 11 MOTION FOR SANCTIONS AGAINST PLAINTIFF WANG, HARTMANN, GIBBS & CAULEY, RICHARD F. CAULEY, JEFFREY C.P. WANG, AND FUTURE LEAD ATTORNEY FOR THE PLAINTIFF** on the interested party(ies) in this action by placing a true and correct copy thereof enclosed in a sealed envelope address as follows:

John Van Loben Sels
WANG, HARTMANN, GIBBS & CAULEY
2570 WEST EL CAMINO REAL
SUITE 440
MOUNTAIN VIEW, CA 94040
johnvanlobensels@whgclaw.com

X  By E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order on an agreement of the parties to accept service by e-mail or electronic transmission, I transmitted the document(s) electronically to the person(s) at the email address(es) listed above. The transmission was reported as complete and without error.

X  By FedEx OVERNIGHT SERVICE: I caused said document(s) to be sent via FedEx on November 6, 2010, to the addressee above.

Executed November 6, 2010 at Windsor, England.

CENDRINE HARKER-WITTEN

1

CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per F.R.Civ.P. 5 on December 6, 2010.


___/s/ Jason B. Witten___
Jason B. Witten

Defendants' Fed.R.Civ.P. Rule 11 Motion for Sanctions