WITTEN LAW, LTD.
Jason B. Witten (SBN 220612)
Blackwell House
Guildhall Yard
London, England EC2V 5AE
Email: j.witten@wittenltd.com
Tel.: 011-44-203-287-9500

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| WANG, HARTMANN, GIBBS & CAULEY, PLC., a Corporation,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>JASON BRIAN WITTEN, an individual; and WANG, HARTMANN, GIBBS & CAULEY, LTD., a United Kingdom Private Limited Company,<br><br>　　　　　Defendants. | Case No. SACV10-1499-JVS (MLGX)<br>Assigned for All Purposes to:<br>Judge James V. Selna<br><br>**DECLARATION OF JASON WITTEN IN SUPPORT OF DEFENDANTS' WITTEN AND WANG, HARTMANN, GIBBS & CAULEY, LTD.'S NOTICE OF MOTION AND MOTION FED.R.CIV.P. RULE 11 MOTION FOR SANCTIONS AGAINST PLAINTIFF WANG, HARTMANN, GIBBS & CAULEY, RICHARD F. CAULEY, JEFFREY C.P. WANG AND ANY FUTURE LEAD ATTORNEY FOR PLAINITFF**<br><br>Hearing:<br>Date: January 24, 2011<br>Time: 1:30 pm<br>Dept. 10C |

I, Jason B. Witten, declare:

　　　　1.  I am a party in the above referenced action. I have personal knowledge of the following and if called upon could and would competently testify thereto.

1

Decl. Witten in Support of Defendants' Fed.R.Civ.P. Rule 11 Motion for Sanctions

2. Jeffrey Wang ("Wang") founded Wang, Hartmann, Gibbs & Cauley, PLC ("WHGC CA") in 1994 as The Law Offices of Jeffrey Wang. I joined it in 1998.

3. In or about the Winter of 2007, I discussed opening a European based branch of "Wang, Hartmann, Gibbs & Cauley" with Wang. I prepared a powerpoint presentation for this. A true and correct copy is attached hereto as Exhibit A. At that time Wang represented to me that I should wait for a couple of years and perhaps we would open a branch in London, England.

4. In 2008, I invested my own money into bar review materials for the Bar Exam of England and Wales, paid for said exam myself, and passed it becoming a licensed solicitor in England and Wales.

5. In the Summer of 2009, I traveled on my own money to Europe looking at the possibility of opening a UK office. I reported back in a memo sent on or about July 18, 2009 by email to Wang that some of WHGC UK's current clients had offices in Europe with European needs that WHGC could likely make clients of a UK office, if it were established. Based upon what I saw: 1) The international clients WHGC CA were servicing in the US and Asia also required EU services; and 2) The UK office could fill that need and be profitable. A true and correct copy of the memo redacted to protect client identities is attached hereto as Exhibit B.

6. In the Summer of 2009, I raised with Wang the issue of opening an independent office of WHGC CA in the United Kingdom (this became Defendant Wang, Hartmann, Gibbs & Cauley, Ltd., the "UK Office"). I prepared a draft business plan for the UK Office and discussed it with Wang.

7. In the Fall of 2009, after reviewing and considering the business plan, Wang on behalf of himself and WHGC CA told me that he would allow me to open the UK Office. Wang instructed me to investigate the variables of having a multi-attorney firm in London.

8. On December 23, 2009, I finished the business plan incorporating the multi-attorney variable Wang had requested (the "Business Plan"). On the same date, I gave the

Business Plan to Wang, and another partner of the firm, Franklin Gibbs ("Gibbs"). A true and correct copy of the Business Plan is attached hereto as Exhibit C.

9. The Business Plan states the following terms:

A. Regarding ownership of the UK Office at Ex. C pages 2, 5 and 10:
1) I was to be the only investor, take all of the risk in the UK Office and be its sole owner.
2) Profits to WHGC CA from the UK Office were limited to the license fee to use the "Wang, Hartmann, Gibbs & Cauley" and "WHGC" marks.

B. Regarding salary for work for WHGC CA at Ex. C pages 2 and 5:
1) I was guaranteed for one (1) year to continue to earn my WHGC CA salary by working on WHGC CA files assigned by Wang. I had to work on these files in addition to my work at the UK Office. Since the venture started in March, 2010, the year would expire at the end of February 28, 2011.

C. Regarding the kinds of files that would be assigned to the UK office at Ex. C pages 4 and 5:
1) Selectively supporting WHGC CA's <u>current client base</u> as they develop European business requirements <u>and to develop a new client base</u>.
2) Leverage WHGC CA's <u>current business</u> to take advantage of Europe.
3) Concentrate on the development of the following areas of business:
A) International Business Transactions between the US, China and Europe with a focus on bringing clients to China, litigating their commercial disputes, and providing guidance on corporate and commercial matters in these jurisdictions;
B) Intellectual Property prosecution and litigation in the <u>US, and litigation in the EU and China</u>;
C) Business litigation in the <u>US and EU, and arbitration in China</u>; and

>>D) General business services such as employment issues and corporate guidance on the start-up, growth and sustainability of <u>businesses in the US, China and Europe</u>.

> D. Regarding the License to use "Wang, Hartmann, Gibbs & Cauley" and "WHGC", the Business Plan states at Ex. C pages 2, 5 and 10 that the UK Office had a License to use these marks in exchange for 5% of the UK Office's profits after taxes each year.

10. In the Winter of 2009-2010, Wang reviewed the terms in the Business Plan and gave his final authorization to Witten to open the UK office.

11. Wang was authorized by WHGC CA to make the representation, because Wang is the 99.9% shareholder of WHGC CA and is the alter ego of WHGC CA. At all times herein mentioned there existed a unity of interest and ownership between Defendant Wang and Defendant WHGC CA, such that any individuality and separateness between Defendant Wang and WHGC CA has never existed, and Defendant WHGC CA is the alter ego of Defendant Wang.

12. In fact, in or about 2010 Wang and WHGC CA stipulated and admitted to Wang being the alter-ego of WHGC CA in the case entitled <u>Pumilia, Patel & Adamec, LLP vs. Wang, et al.</u> filed in Los Angeles Superior Court, Case No. BC399158. In the motion entitled "Defendant/Cross-complainant's Motion in Limine (To Exclude Evidence of the Ownership Structure and Financial Condition and Operation of WHGC)" ("Alter Ego Motion"), Wang admits that:

> A. He is the alter-ego of WHGC CA. The Alter Ego Motion and its Ex. C;
> B. Wang owns 99.9% of WHGC CA. Ex. B to Alter-Ego Motion, p. 441, line 11;
> C. Of the 10,003 shares in WHGC CA, Wang owns 10,000. Ex. B to Alter-Ego Motion, p. 441, line 11. Cauley, Hartmann and Gibbs each own 1 share. Ex. B to Alter-Ego Motion, p. 439, lines 7-24;
> D. Wang promotes Hartmann as a name partner at WHGC CA even though Hartmann runs his separate law office, The Hartmann Law Firm, out of the same

offices as WHGC CA, and is not connected with WHGC CA in any way other than in name only. Ex. B to Alter-Ego Motion, p. 445, lines 8-25. This is also supported by Hartmann's own California Bar profile.

A true and correct copy of this public document retrieved from the LA County Superior Court along with the receipt for same is attached hereto as Exhibit D. A true and correct print out of Hartmann's attorney profile from the California Bar website is attached hereto as Exhibit E.

13. Related to the foregoing, Wang holds an attorney, John Van Loben Sels out as a partner in WHGC CA. A true and correct printout from WHGC CA's website confirming same is attached hereto as Exhibit F. However, if the motion in the Pumilia case, supra is accurate, Wang owns 10,000 of the outstanding shares of WHGC CA, and Hartmann, Gibbs and Cauley collectively own 3 shares as set forth in the above motion, that means that Wang has not issued any shares to Van Loben Sels. Thus, Wang is causing WHGC CA to mislead the public as to Van Loben Sel's position in WHGC CA, similar to what he does with Hartmann.

14. Further, I had been with WHGC CA for twelve (12) years, and personally know that Wang is the alter ego of WHGC CA. For example, WHGC CA claims to operate an office in Taiwan and an office in Beijing, but in fact has no attorneys in either alleged office. A true and correct copy of the locations section of the website is attached hereto as Exhibit G. Rather, it is an illusion created by Jeffrey Wang to make potential and existing clients believe he has a presence in those countries when he does not. Close scrutiny of the attorneys listed at WHGC CA's website reveals that there are no WHGC CA attorneys working out of the China and Taiwan offices, and there are no WHGC CA attorneys even licensed to practice law in China. Further, that in order to perpetuate this fraud, Wang has lied on forms to the Chinese government stating that Witten would be stationed in the China office. I know because he put my name on it and he told me he did.

15. Further, that Wang, likely in violation of professional ethics, shared client fees with a Taiwan attorney named George Chen, such that he has paid George Chen a set

percentage of the fees he receives from clients that George Chen refers to Wang on a regular basis.

16. Moreover, that none of the "partners" in WHGC CA have any independent authority. Wang wields all authority over them and threatens to fire them whenever they disagree with him. All of them have come up for firing in the last two (2) years for a variety of reasons that change with Wang's mood.

17. Further still, that Wang operates a secret company, International Business Advisory Group, Inc. ("IBAG") out of the same office as WHGC CA's Newport Beach address. This company apparently operates an Employee Stock Ownership Plan for four to seven (4-7) employees, though it is a mystery as to who they could be, since WHGC CA is certainly not owned by its employees. Further, I was employed at this address for years and there is no discernable corporate activity for IBAG there. Accordingly, it must derive its income from WHGC CA in some manner. True and correct printouts of the Secretary of State Website and a business information service showing IBAG's address and purpose as an ESOP are collectively attached hereto as Exhibit H.

18. In fact, Wang causes IBAG to purchase office equipment that Wang interchanges with WHGC CA. In fact, the computer Wang issued to me at WGHC CA, and subsequently brought with me to the UK, that contains attorney client and attorney work product privileged information is registered to IBAG, and believed to owned by IBAG. The propriety of which appears dubious. A true and correct copy of the registration information off of the computer's screen shot is attached hereto as Exhibit I.

19. Wang and I spoke about the details of the Business Plan from time to time up through the end of February, 2010. I requested of Wang that we have a written contract to confirm what the plan was for the business. Wang simply stated on several occasions that, "You can  pretty much run it how you want." Wang last stated this on February 26, 2010, the last workday before I left for England to start the UK Office.

20. Since Wang had left the terms of my control of the UK Office quite broad, and I did not want any of the type of issues this action presents, I confirmed in a March 1, 2010

1  email to Wang that I would run the UK Office as it had been set forth in the Business Plan
2  Wang had agreed to. A true and correct copy of this email is attached hereto as Exhibit J.

3  21. Wang never refuted this. Based on the foregoing actions and representations by
4  Wang, I moved my whole family to England and began performance. Based on the
5  preliminary memo (Ex. B), the Business Plan (Ex. C), Wang's representation and my
6  October 1, 2010 email (Ex. J), and my performance, the terms of the Business Plan
7  constituted the "Agreement" and I followed it.

8  22. As was further set forth in my March 1, 2010 email, upon arriving in England I
9  immediately began the task of incorporating the UK Office, formally entitled "Wang,
10 Hartmann, Gibbs & Cauley, Ltd." Ex. J. I invested my own hard earned money in the
11 "WHGC" name, and took a tremendous risk in opening the UK Office. On April 27, 2010,
12 the UK Companies House issued the UK Office's Certificate of Incorporation. A true and
13 correct copy of it is attached hereto as Ex. K. On or about May 4, 2010, I emailed the
14 Certificate of Incorporation from the UK Companies House for Wang, Hartmann, Gibbs &
15 Cauley, Ltd. to Wang. That email should be on WHGC CA's NetDocs server, but was
16 automatically removed from my computer to the NetDocs server due to the passage of time.

17 23. Further, pursuant to the plan for the UK Office to service WHGC CA's current
18 clients' needs in the EU, in the latter half of March, 2010, once the UK Office had a
19 physical address, I contacted several select clients informing them of the new UK Office. I
20 am informed and believe and thereon alleges that I carbon copied Wang on some or all of
21 these emails. Those emails should be on WHGC CA's NetDocs server, but were
22 automatically removed from my computer to the NetDocs server due to the passage of time.
23 Further, Wang and I would talk on occasion of this as well.

24 24. Moreover, as set forth in the Business Plan, I continued to work for WHGC CA
25 and I continued to draw my guaranteed salary from WHGC CA for the work that I did that
26 I billed through WHGC CA; submitting monthly timesheets to WHGC CA management.

Decl. Witten in Support of Defendants' Fed.R.Civ.P. Rule 11 Motion for Sanctions

In addition, I returned to California in April, May and August, 2010, and in June, 2010 met Wang in China for work over 10 days, to support WHGC CA with my physical presence, and to appear for a critical hearing for a client in May, 2010 in LA County Superior Court. During these trips Wang would comment that he hoped the UK Office would fail so that I would return to WHGC CA full time.  It started off gently, but on my last trip in August, 2010, Wang's comments got very serious.  I reminded Wang that, as set forth in the Agreement, I had at least a year to try to get the UK Office up to where it could support my salary and to see if it worked.  At the end of the year, WHGC CA could terminate my salary and I could tough it out on my own at the UK Office, or I could physically return to WHGC CA.  Wang did not deny that this was the Agreement.

25. Backing up a little in time, at the end of June 2010, I was forwarded a lead on a new matter from a partner at WHGC CA in the form of an email from Client "S" stating that it specifically needed the services of an EU firm, and wanted to talk to the UK Office. A true and correct copy of this email redacted to protect client identities is attached hereto as Exhibit L.  The partner who forwarded the lead, Van Loben Sels, was Client S's primary attorney at WHGC CA.  This matter involved EU trademark law and Dutch Customs.  This was exactly the kind of case the UK office was started for: a current client that needed an EU firm to handle an EU legal issue – a matter that WHGC CA could never before get.  I communicated with Client S to win its business specifically stating it would be retaining the UK office, and the Partner was carbon copied on this email.  A true and correct copy of this email redacted to protect client identities is attached hereto as Exhibit M.

26. When Client S sent, via email, the UK Office's executed engagement agreement and bank wire receipt, it was sent to me as well as Van Loben Sels and a paralegal to Wang, Halai Hashimi, who sits right outside Wang's office ("Wang's Paralegal").  Wang's Paralegal forwarded it to WHGC CA's lead paralegal, Faiza Anwar ("Office Manager 2"), who has office management duties directly under WHGC CA's head office manager and Office Manager 2 forwarded it to WHGC CA's head office manager, Wang's wife, Elaine Wu ("Wu").  A true and correct copy of this chain email redacted to protect client identities

is attached hereto as Exhibit N.  Thus, WHGC CA had both the UK Office's engagement agreement and the banking information from the UK Office.  It thus was fully disclosed at every level – partner, office manager and paralegal, that it was the UK Office that had been retained and had issued bank wire instructions, because that is what Client S wanted and required, and that was the purpose of the UK Office pursuant to the Agreement.

27.   On or about June 24, 2010, Office Manager 2 asked me how the file and retainer for Client S's matter should be handled.  I told her and Wu it was a UK Office matter to be handled by the UK Office.  I further explained that Van Loben Sels' time should be billed to the UK Office on the project, if any, and the UK Office would be responsible for it.  A true and correct copy of this email chain redacted to protect client identities is attached hereto as Exhibit N.   Office Manager 2 followed up with me stating that Wu wanted any money forwarded into a foreign currency account.  I told her that I would be happy to send payment on any bill for Van Loben Sels' time to that account.  A true and correct copy of this email redacted to protect client identities is attached hereto as Exhibit O.  A week later, on June 30, 2010, after the matter was successfully concluded, Wu emailed me about sending her the money solely for tax reasons.  I told her the matter was completed, and Van Loben Sel's time was nominal, if any, thus there were no tax issues for WHGC CA.   A true and correct copy of this email chain redacted to protect client identities is attached hereto as Exhibit P.  That was the end of the matter.  Indeed, I was in WHGC CA's Newport Beach office for almost 2 weeks in August, 2010 spending a lot of time with Wu and Wang, and the issue never came up at all.

28.   In September 2010, things took a turn for the worse.  On September 9, 2010, I was informed by another name partner at WHGC CA, Gibbs, that Wang was acting erratically and beginning to plot as to how to have me return to WHGC CA and abandon the UK office.  Further, that Wang was reminded by Gibbs that I had a year to get the UK office up and running before WHGC CA cut-off work to me, effectively cutting-off my income from WHGC CA, but that Wang was growing increasingly irrational, beginning to deny that there was any Agreement, simply because he had not signed anything.

Decl. Witten in Support of Defendants' Fed.R.Civ.P. Rule 11 Motion for Sanctions

29. On September 10, 2010, Wang asked me if he had forwarded Client S's money for the EU issue to WHGC CA. I explained the same thing to Wang as I had to Van Loben Sels, Wu and Office Manager 2 two and a half (2 ½) months earlier, as set forth, above, and then heard nothing. A true and correct copy of this email chain redacted to protect client identities is attached hereto as Exhibit Q.

30. On September 16, 2010, Wang had Gibbs write me an email stating that the UK office had no future, that Wang was worried that the UK's services in the EU would incur liability for WHGC CA that WHGC CA was not insured to cover, and urging me to immediately abandon the practice and return to WHGC CA full time. A true and correct copy of this email redacted to protect client identities is attached hereto as Exhibit R.

31. On September 16, 2010, I immediately responded that returning to California was not feasible, that the worries were misplaced, and that the Agreement between me and Wang on behalf of WHGC CA was that I had a guaranteed year of salary and a year to get the UK office up and running. A true and correct copy of this email is attached hereto as Exhibit R.

32. It is at this point, on September 17, 2010, more than six (6) months after I had moved to England, that Wang for the first time expressly stated in an email his intent to repudiate the Agreement regarding my salary. A true and correct copy of this email is attached hereto as Exhibit R.

33. On September 18, 2010 UK time, I immediately emailed Wang back expressing my shock at Wang's repudiation. A true and correct copy of this email is attached hereto as Exhibit R.

34. On or about September 20, 2010, Wang and I spoke on Skype face to face attempting to settle our differences. When face-to-face, Wang said that he would drop his wrongful demand for the money the UK Office made on the Dutch Customs matter for Client S. Further, Wang rescinded his repudiation of the Agreement between the parties as set forth in the paragraph above. Rather, he stated that because WHGC CA's insurance would have been too expensive to insure me for both US and EU work, I was to become "of

counsel" to WHGC CA, and my name would be removed from WHGC CA's website. Wang represented that he would continue to have me work on my existing files as an independent contractor at set amount per hour. Wang instructed Gibbs to confirm this in an email to me, which Gibbs did. A true and correct copy of this email from Gibbs is attached hereto as Exhibit S.

35. On September 21, 2010, I discovered that Wang's alleged worry about insurance coverage for my EU work was not true. Specifically, to test Wang's representation, I sent Wang and Wu an email informing them that Client "E" had an issue involving their distributors in the EU who were using Client E's trademark, and that Client E needed counsel regarding EU trademark law to get them to stop. Wu wrote back the same day, carbon copying Wang, stating that I should handle the matter through WHGC CA. A true and correct copy of relevant portions of this email chain redacted to protect client identities is attached hereto as Exhibit T. However, according to Wang and Gibbs, WHGC CA was not insured to cover this type of work. See Gibbs Email in Ex. R.

36. Therefore, insurance had nothing to do with the reason Wang changed me to "of counsel" status and removed me from the website. It was pure greed. Between this and the issue with Client S, clearly all Wu and Wang cared about was circumventing the UK Office and making all the money from the opportunity the UK office had created. They were pushing me out because of greed. This was a complete breach of the Agreement.

37. As part of the "of counsel" arrangement, Wang instructed me to send a list of my active files to Gibbs with estimates of time for work to be completed. Wang represented that Gibbs and Wang would manage the flow of work to me. I followed the instruction.

38. One of the major projects to be completed over September and October, 2010, was for me to file a Motion for Default Judgment worth approximately $2,000,000 for WHGC CA's Client "D". When Wang learned of this, Wang told Gibbs that a principal of Client D instructed him to not pursue the Motion for Default Judgment and to terminate the case immediately. He had Gibbs email me with the instruction to cease all work and

terminate the case. A true and correct copy of this email redacted to protect client identities is attached hereto as Exhibit U.

39. I was shocked at this instruction and emailed the President of Client D to confirm. In two (2) emails, the President and Vice-President of Client D vehemently denied ever making such an instruction; asking Wang what kind of games he was playing. A true and correct copy of this email chain redacted to protect client identities is attached hereto as Exhibit V.

40. It was clear that Wang had lied about this client instruction, a lie that would have cost Client D $2,000,000. That is when it became apparent to me that Wang was intent on having WHGC CA breach the Agreement.

41. On September 30, 2010, I received an email from Gibbs stating which files I would continue working on. Missing from the list were three (3) clients that I was in the middle of providing services for, and two (2) clients that I had brought in for WHGC CA.

42. Specifically, the following salient issues required client consent in order to take me off their case:

A. Client "T adv. C". Wang instructed Witten to lead the settlement of this case and that is what Witten had done. This was at the end of the case and Witten was in delicate negotiations of the settlement documents with opposing counsel. It was not prudent to be removing Witten from this case at this time. He only had about ten (10) more hours of work left on it, at most, over the next week or two.

B. Client "C". Witten had signed this client to WHGC CA. Witten was the primary attorney assigned to it. The principal of Client C contacted Witten when he had a question or further work. The principal had just instructed Witten to prepare a loan agreement for him related to an investment structure for one of his investors that Witten was up to speed on. Witten offered to forward to Gibbs Client C's instruction for Witten to prepare the loan agreement and prepare corporate minutes to reflect the investment structure. The instruction was clear. The work only amounted to about eight (8) hours a month of work,

and would have likely ended shortly since the business Witten had incorporated for Client C was almost up and running.

C. Client "TMB". Witten signed this client to the firm as well. It was corporate formation work and commercial contracts which were the reasons Witten was asked to land Client TMB. Further, the principal of Client TMB was from Witten's hometown of Huntington Beach, they knew the same people, and they went to the same church. It was only likely to be about twenty (20) hours of work.

D. Client "C adv. L". Witten had been Client C adv. L's attorney since 2005. Witten was at the end of his litigation matter that had thirty (30) years of facts and five (5) years of litigation history. Witten won an interlocutory Order for him in 2007 after a week-long bench hearing/trial. After 5 years of litigation, it was well know that the client was extremely adverse to changes in his case. The work remaining included signing deeds pursuant to a partition in kind of real property, and finalizing the interlocutory Order into a final judgment that included an accounting that had been completed, but needed to be updated. After that, there was an issue of costs, and a CCP §998 offer made in 2007 that would come into play.

43. On September 30, 2010, Witten sent an email to Gibbs suggesting he reconsider taking away these clients without the clients' consent by emphasizing the foregoing reasons. Despite this admonishment, on October 1, 2010, Gibbs replied by email that Witten would not be placed back on these cases. A true and correct copy of this email chain redacted to protect client identities for paragraphs 41-43 is attached hereto as Exhibit W.

44. These clients were never informed of their right to choose me as their counsel. They were treated like chattel and instructed that their file would be handled by a different attorney within WHGC CA. This was a clear violation of the ethical duty to inform the clients that they had a choice of which attorney to have work on their case, as discussed in Cal. Bar Ethics Op. No. 1985-86.

45. Wang was now violating client rights to try to destroy me by denying him access to any income and to any clients, wherever possible.

46. On October 30, 2010, Wang breached the attorney client and work product privileges between the UK Office's clients and me. Wang knew I handled all of my email for the UK Office on WGHC CA's email server. Wang broke into my UK Office email and read the bills the UK office had sent its clients. One of the bills was to the UK Office's Client "TI" for about $4,000. Wang conspired with his office manager, and wife, Wu, to prepare a fraudulent invoice to Client TI. Specifically, Wang and Wu prepared an invoice from WHGC CA that copied my time entries from the UK Office and reissued it as an invoice from WHGC CA. Wang and Wu then caused it to be emailed to Client TI with instructions to pay WHGC CA instead of the UK Office. A true and correct copy redacted to protect client identities of this email to client TI referencing the fraudulent invoice is attached hereto as Exhibit X. Of course, Wang, Wu and WHGC CA attempted to conceal their wrongdoing by not sending a copy of the email to me.

47. Further, Wang instructed Gibbs to prepare a letter to Client TI, stating that they would be happy to come to Client TI for a meeting. A true and correct copy of this letter is attached hereto as Exhibit Y.

48. On Saturday, October 2, 2010, I was informed by Client TI of WHGC CA, Wang and Wu's wrongful issuance of the fraudulent invoice and the fraudulent letter.

49. It was at this point that I realized that WHGC CA had, without prior notification to me or the clients, cut-off my access to the firm email, including the email used by the UK Office, completely cutting off all email communications with <u>all</u> of the clients to whom I was providing services. In addition, Wang cut-off my WHGC CA cell phone account effectively making it impossible for WHGC CA clients to contact me, since they did not know his UK Office telephone number. Further, Wang had instructed Richard Cauley ("Cauley"), another partner at WHGC, to falsely accuse me of converting Client TI from WHGC CA; even demanding disgorgement of any moneys paid by Client TI, and attempting (without success) to impede the UK office from carrying on business with the WHGC trademark, in a blatant breach of the license component of the Agreement. A true and correct copy of this email is attached hereto as Exhibit Z.

50. The allegations by Defendants related to Client TI were completely false. I immediately responded over two (2) emails, discussing the UK Office's and my relationship with Client TI, informing WHGC CA that Client TI was not a client of WHGC CA. Specifically, Client TI had not been a client of WHGC CA for some time due to a bad experience Client TI had with WHGC CA management over eighteen (18) months prior. I was able to win Client TI's business back, but only on Client TI's instruction that it be a client of the UK Office. Client TI wanted nothing more to do with WHGC CA. The last work Client TI had WHGC CA do after its bad experience eighteen months earlier, was some emergency work that coincided with my leaving to open the UK Office in February/March, 2010. Client TI wanted me to handle the matter through the UK Office, but it had not been established yet. Since it was an emergency, I told him I would handle it through WHGC CA, and after that, Client TI did not want any further matters handled through WHGC CA. As such, I had not converted a client of WHGC CA. If WHGC CA, Cauley or WHGC had done any investigation before making such a preposterous claim, they would have known better. I included two (2) emails from Client TI supporting this. True and correct copies of Client TI's emails to me confirming that it preferred to be the client of the UK Office, are collectively attached hereto as Ex. AA. In the same two emails I sent to WHGC CA, I instructed WHGC CA to cease interfering with the UK office's clients, and to cease reading the privileged and confidential email between the UK Office and its clients.

51. On October 4, 2010, since due to Wang/WHGC's wrongful acts I had no functioning company email or telephone for clients to contact me on in violation of Ca. RPC 3-500, I established a new email address "@whgc-uk.com" to communicate with clients. I informed Wang of this new email address on October 5, 2010.

52. On October 5, 2010, without my knowledge, Wang caused a different WHGC CA partner, Cauley, to file the sanctionably frivolous Complaint in this action falsely alleging that the UK Office was a secret I kept from WHGC CA, that I was converting clients, and that I was infringing WHGC CA's trademark.

Decl. Witten in Support of Defendants' Fed.R.Civ.P. Rule 11 Motion for Sanctions

53. On October 5, 2010, I was contacted by Client E at the "whgc-uk" email address, above, with critical work to be performed. I informed Wang and Gibbs of this in two (2) emails during business hours before contacting the client. Wang and Gibbs never responded. I contacted Client E and explained the situation. Client E issued instructions to Wang and Wu for me to work on the file. True and correct copies of these emails are collectively attached hereto as Exhibit BB. I waited until the next day, October 6, 2010 to undertake the work giving Wang and WHGC CA time to object. They did not object, and I performed the work.

54. Further, on October 5, 2010, Cauley instructed me to participate in a 2 hour meeting with clients to take place on October 6, 2010, and I did so. A true and correct copy of this email chain is attached hereto as Exhibit CC.

55. As such, Defendants Wang and WHGC had filed a completely specious and frivolous Complaint full of lies about me and the UK office, all the while hiding this from me, and still hypocritically asking me to work on files for WHGC CA and instructing me to hold myself out as WHGC CA to clients.

56. On October 7, 2010, I received a letter from Cauley stating that I was no longer "of counsel", and the use of WHGC CA's trademarks was no longer permitted. It mentioned nothing of the lawsuit. It was a full, complete and final breach of the Agreement, loss of $58,000 in remaining salary for the year, and loss of the WHGC marks.

57. I had no desire to be a part of WHGC CA any more and immediately ceased use of the WHGC CA's marks on October 7, 2010. A true and correct copy of the confirmation of termination of the "whgc-uk.com" email account, UK Office's resolution to change its name is as well as the form that was submitted to the UK Companies House for the name change are collectively attached hereto as Exhibit DD.

58. Based on the foregoing, it is clear that Wang never wanted the UK Office to succeed, and when faced with its success, set in motion a wrongful course of action to try to destroy me, including the filing of the present frivolous action.

59. I was informed of this lawsuit by a reporter on October 9, 2010.  WHGC CA had tried to keep it secret.  I immediately began detailed settlement negotiations with Cauley at WHGC CA who had been designated to act for it.

60. In anticipation of this Rule 11 Motion, I put Cauley and WHGC CA on notice of the foregoing facts in an October 12, 2010 settlement communication.

61. Cauley is the senior litigator at WHGC CA.  He has been handling civil litigation for approximately 30 years.  He is a graduate from University of Michigan Law School, and before becoming a name partner at WHGC CA several years ago, he was a partner at the national law firm of McDermott, Will & Emory.  A true and correct copy of his bio from the WHGC CA website is attached hereto as Exhibit EE.

62. As a partner in WHGC, and as its attorney (representing itself), on October 15, 2010, Cauley made a written settlement offer to the UK Office and me.

63. On October 20, 2010, the UK Office and I unequivocally accepted the settlement offer in writing.  However, on October 25, 2010 I discovered on my own while checking the docket on PACER that WHGC CA had filed the First Amended Complaint.

64. On or about October 30, 2010, Cauley, on full notice of the frivolousness of his pleadings in this action, abandoned his prosecution of this action and Witten is informed and believes that Wang forced Van Loben Sels through improper coercion unrelated to the merits of this action to become the attorney handling it.  A true and correct copy of Van Loben Sels' email informing me of his taking the case is attached hereto as Exhibit FF.

65. A true and correct copy of England's Solicitor's Code of Conduct Rules 8 & 9 are collectively attached hereto as Exhibit GG.  The term "lawyer" in these rules means a licensed UK attorney.

66. I have never disclosed any secrets about WHGC.

67. I have heard from my clients that Wang is telling clients that he has sued me for the ridiculous claims in the Complaint and First Amended Complaint in an attempt to dissuade them from choosing my services.

68. I am handling this matter myself, and thus have no attorneys' fees for the Court to impose as sanctions on the offending filers. However, I have spent, and will spend approximately 50 hours on this Motion that I would have been billing clients for at $400 per hour ($20,000), travel costs from London to Orange County in the amount of $2,000 for the hearing, filing fees in the amount of $700, and courier fees in the amount of $300.

69. This Motion, Declaration, Proposed Order and the supporting documents were served by email and courier on WHGC CA at least twenty (21) days before filing of the Motion.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct. Signed this 5th day of November, 2010 in Windsor, England.

*/s/ Jason Witt*

Jason Witten

PROOF OF SERVICE

<u>WANG, HARTMANN, GIBBS & CAULEY, PLC V. JASON BRIAN WITTEN, ET AL.</u>

USDC-CENTRAL CASE NO.: SACV10-1499-JVS (MLGX)

COUNTY OF BERKSHIRE, ENGLAND

I am employed in the County of Berkshire, England. I am over the age of 18 and not a party to the within action. My business address is Blackwell House, Guildhall Yard, London, EC2V 5AE, England.

On November 6, 2010 I served the foregoing document described as:

**DECLARATION OF JASON WITTEN IN SUPPORT OF DEFENDANTS' WITTEN AND WANG, HARTMANN, GIBBS & CAULEY, LTD.'S NOTICE OF MOTION AND MOTION FED.R.CIV.P.RULE 11 MOTION FOR SANCTIONS AGAINST PLAINTIFF WANG, HARTMANN, GIBBS & CAULEY, RICHARD F. CAULEY, JEFFREY C.P. WANG AND FUTURE LEAD ATTORNEY FOR PLAINTIFF** on the interested party(ies) in this action by placing a true and correct copy thereof enclosed in a sealed envelope address as follows:

John Van Loben Sels
WANG, HARTMANN, GIBBS & CAULEY
2570 WEST EL CAMINO REAL
SUITE 440
MOUNTAIN VIEW, CA 94040
johnvanlobensels@whgclaw.com

X    By E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order on an agreement of the parties to accept service by e-mail or electronic transmission, I transmitted the document(s) electronically to the person(s) at the email address(es) listed above. The transmission was reported as complete and without error.

X    By FedEx OVERNIGHT SERVICE: I caused said document(s) to be sent via FedEx on November 6, 2010, to the addressee above.

Executed November 6, 2010 at Windsor, England.

CENDRINE HARKER-WITTEN

1

CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per F.R.Civ.P. 5 on December 6, 2010.

                                       /s/ Jason B. Witten
                                       Jason B. Witten